**CHERRY, BEKAERT & HOLLAND, Plaintiff,**

v.

**Katherine W. DOWNS, as Executrix of the Estate of Joseph R. Downs, Defendant.**

**No. C–C–85–402–P.**

United States District Court, W.D. North Carolina, Charlotte Division.

Aug. 1, 1986.

Gaston H. Gage, Parker, Poe, Thompson, Bernstein, Gage & Preston, Charlotte, N.C., for plaintiff.

Mark W. Merritt, Robinson, Bradshaw & Hinson, Charlotte, N.C., for defendant.

## MEMORANDUM OF DECISION

ROBERT D. POTTER, Chief Judge.

The Plaintiff filed this action on June 19, 1985 seeking a declaratory judgment pursuant to 28 U.S.C. § 2201 that the agreement between the parties does not entitle Defendant to the commission which he claims. The Defendant filed an answer and counterclaim for commissions which he claimed for the promotion of the mergers with Severance and Shapr and Conrad, Hoey, East & Co.

The Defendant died on January 10, 1986, and pursuant to Order of this Court filed February 18, 1986, the Executrix of the Estate of the Defendant was substituted as Defendant and Counterclaimant in this action, and will be referred to herein as Defendant.

The Court has jurisdiction over the subject matter of this action under and by virtue of 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391(a) and the Court has personal jurisdiction over the Defendant pursuant to N.C.Gen.Stat. § 75.-4(5)(a) and (b).

This matter came on before the undersigned sitting without a jury at Charlotte, North Carolina on June 25, 1986. The Plaintiff was represented by Gaston H. Gage, Attorney at Law, and the Defendant was represented by Mark W. Merritt, Attorney at Law.

When the case was called, the parties informed the Court that they had Stipulated to the Facts which had been filed on July 14, 1986.

The Plaintiff then called one witness, Mr. Eric C. Pressley a partner with the Plaintiff who testified that beginning July 31, 1984 he had spent 64.0 hours on the Severance and Sharp merger and 91.5 hours, beginning October 15, 1984, on the Conrad, Hoey and East mergers, as shown on Plaintiff's Exhibit 1. He also identified Plaintiff's Exhibits 2 and 3.

Mr. Pressley testified that between the time of Defendant's termination on May 1, 1983 and July 15, 1984, there had been no negotiations between the Plaintiff and Severance & Sharp and that tax problems had prevented the negotiations begun by Downs in 1974 from developing into a merger with the Plaintiff, and that the tax problems with the merger with Severance and Sharp had not been under consideration prior to the time of termination of the agreement between Plaintiff and Defendant.

Pressley also testified that September 3, 1981 was Defendant's last contact with Conrad, Hoey and East, that Defendant's assistance in any negotiations and that his only involvement with either Severance or Conrad, Hoey was after May 1, 1983.

Based on the above testimony and the Stipulation of Facts by the parties, the Court enters the following Findings of Fact:

## FINDINGS OF FACT

(1) This lawsuit involves a dispute over whether Joseph R. Downs ("Downs")

is owed commissions by Cherry, Bekaert & Holland ("CB & H") for his involvement in mergers between CB & H and two other accounting firms. On June 19, 1985, CB & H filed a declaratory judgment action in which it sought a determination that it did not owe commissions to Downs pursuant to a Special Partnership Agreement (the "Agreement"), entered into between the parties on May 1, 1973. On July 31, 1985, Downs filed a counterclaim in which he contends that he is owed commissions pursuant to the Agreement with CB & H for the role he played in promoting the mergers of CB & H with the two other accounting firms.

(2) CB & H is an accounting firm with its principal office in Charlotte, North Carolina. Downs was a Certified Public Accountant who lived and practiced his profession in Marietta, Georgia. In 1973, CB & H was interested in expanding its practice by merging or by acquiring other firms. Downs and CB & H negotiated for an agreement by which Downs would assist CB & H in its expansion by finding and soliciting other firms for CB & H to merge with or acquire. The parties entered into a Special Partnership Agreement on May 1, 1973. A copy of the Agreement is attached hereto as Exhibit A. That Agreement's terms and conditions governed Downs' promotion of mergers between CB & H and other accounting firms. Downs promoted mergers pursuant to the Agreement by visiting or contacting other accounting firms located in the Southeast. Many of Downs' visits were "cold calls" to accounting firms that had no prior relationship with Downs or CB & H; others were the result of information that Downs found in trade magazines, during visits to other prospects, or through his personal contacts. Downs would contact a firm to learn about its practice and to ascertain its interest in a merger. If mutual interest in a merger was present, Downs would sol-icit the prospect by providing information about CB & H and would work to consummate the merger. Downs reported the results of his visits and solicitations directly to the managing partner of CB & H, and he worked with the managing partner in consummating mergers.

(3) Between May 1, 1973, and May 1, 1983, Downs promoted thirty-one mergers and acquisitions between CB & H and other accounting firms located in Alabama, Florida, Georgia, North Carolina, and Tennessee. CB & H paid all commissions to which Downs was entitled for his promotion of these mergers pursuant to the Agreement. The Agreement was terminated on May 1, 1983, as provided in paragraph 1 of Article XIV.

(4) The issues in this lawsuit involve Downs' role in promoting the merger of CB & H with the accounting firms of Severance and Sharp in Knoxville, Tennessee, and Conrad, Hoey, East & Co. in Charlotte, North Carolina. CB & H has not paid commissions to Downs for these two mergers. CB & H informed Downs that it does not owe him commissions for these mergers pursuant to the Special Partnership Agreement under Section III either paragraph 6 or paragraph 8. Section III, paragraph 6 of the Agreement, relates to the consummation period for mergers during which Downs will be entitled to a commission. The two mergers in question were not consummated within five years of the dates of Downs' first contact with these firms and, as a result, CB & H contends they became prospects of CB & H for which Downs is not entitled to commissions pursuant to paragraph 6. Section III, paragraph 8 relates to the amount of commissions for mergers promoted by Downs which are consummated within two years of the termination of Downs' relationship with CB & H, and to Downs' entitlement to a commission of two and one-half percent under cer-

tain conditions. During the two-year period provided in paragraph 8, Downs did not "continue to solicit" these firms "by personal visit" nor was he so "requested by the managing partner," and Downs did not submit a written report of visits to the managing partner within two years of his termination on May 1, 1983. Downs informed CB & H, and contends in this lawsuit, that he is entitled to commissions pursuant to paragraph 8 of the Agreement. Paragraph 8 relates to the conditions under which there will be a payment of a commission of two and one-half percent if the merger is consummated within the second year after the termination of Downs' relationship with CB & H. Each merger took place within two years of his termination and Downs contends that he is, therefore, entitled to commissions pursuant to paragraph 8.

(5) The interpretation of the paragraphs mentioned in this Stipulation and any other paragraphs of the Agreement is a question of law for the Court to be determined by construction of the entire Agreement.

(6) The terms and provisions of the Agreement control determination of the issues and there are no other relevant or applicable contractual terms or conditions.

(7) Downs first established contact with a representative of Severance and Sharp concerning a merger with CB & H on May 7, 1974. Downs had a follow-up visit with Severance and Sharp on May 10, 1977. Downs' records reflect that he submitted to CB & H a Prospective Mergee Data report that was filled in by Severance and Sharp dated December 29, 1981, regarding the financial status of its practice. CB & H has no record of this Prospective Mergee Data report. On February 8, 1982, Downs and Gary Wolfe, the managing partner of CB & H, held a meeting with Mr. Sharp and Mr. Wright, the principals of Severance and Sharp, to discuss a potential merger with CB & H. This meeting was Downs' last contact with Severance and Sharp. After Downs worked with Severance and Sharp, they merged with another firm and then demerged before later merging with CB & H. Severance and Sharp merged with CB & H on October 1, 1984. CB & H has paid no commission to Downs for his promotion of this merger.

(8) Downs first established contact with a representative of Conrad, Hoey, East & Co. concerning a merger with CB & H on October 20, 1974, pursuant to a lead given to Downs by CB & H. Downs had follow-up visits with partners of Conrad, Hoey, East & Co. on August 18, 1975; September 5, 1975; August 14, 1978; September 4, 1980; and September 3, 1981. Downs' meeting on September 3, 1981, with Mr. Hoey was his last contact with any representative of Conrad, Hoey, East & Co. Conrad, Hoey, East & Co. merged with CB & H on January 1, 1985. CB & H has paid no commission to Downs for his promotion of this merger.

(9) There are two instances in which Downs received commissions for mergers that he promoted that took place more than five years after his first contact with the prospective mergees. These mergers were with Hill, Flurry, & Company and Dill, Bond & Plumstead. Downs made his first contact with Hill, Flurry on August 14, 1974, and the merger of Hill, Flurry and CB & H took place on January 1, 1983. Downs made his first contact with Dill, Bond & Plumstead on November 7, 1975, and the merger of Dill, Bond and CB & H took place on August 1, 1982. Both of these mergers were consummated before the termination of the Agreement. Downs continued to solicit each of the mergees and made written reports more than five years after first contact at the request of CB & H in each instance until the time each merger was consummated, each merg-

**1100**

er being consummated prior to May 1, 1983.

(10) Downs satisfactorily discharged his obligations under the Agreement from May 1, 1973, to May 1, 1983, when the Agreement terminated. After the end of the relationship, the managing partner of CB & H has not asked that Downs visit any prospects for mergers or that Downs submit written reports of any such visits. Downs has not visited any prospects or submitted written reports to the managing partner since the termination of his relationship with CB & H on May 1, 1983.

### DISCUSSION

This case involves two paragraphs in the Agreement between the parties.

Paragraph 6 under Article III of the Agreement reads:

(6) The "consummation period" for the purpose of this Article shall be (a) a period of five (5) years after the Special Partner's first contact with a prospect reported to and registered by the Managing Partner as above provided or (b) a period of not over two (2) years after the special partner's disability, his retirement, the termination of his relationship with the Firm or his death or (c) the abandonment by the firm of the prospective merger, whichever occurs first. If any such prospective merger is not consummated before the expiration of the consummation period, all prospects shall become prospects of the firm and the Special Partner shall not be entitled to any commission or other compensation although the merger is thereafter consummated by the Firm or any member, employee or agent thereof. Except in the event an abandonment of a prospect by the firm is thereafter reopened by the Firm and a merger is consummated before the expiration of the consummation period applicable to that prospect, the Special Partner shall be entitled to his commissions. . . .

Thus, under this paragraph 6, and the facts of this case the prospective merger giving rise to the commission claimed by the Defendant must have been consummated within 5 years of the first contact by the Special Partner, or within 2 years after the termination of his relationship with the firm *whichever occurs first.* In the two mergers giving rise to the dispute, the 5 year period began from the first contact with Severance and Sharp (S & S) on May 7, 1974 and with Conrad, Hoey, East & Co. (CH & E) on October 20, 1974. The Defendant's relationship with the Plaintiff terminated May 11, 1983.

Thus the "consummation period" first occurring was the end of the five year period from the first contact with both firms and the consummation period as defined in the agreement ended on the 7th day of May, 1979 for the S & S firm and on October 20, 1979 for the CH & E firm. The prospective mergers with these two firms not having been consummated within the "consummation period" as defined in the Agreement they became prospects of the firm and the Defendant was therefore not entitled to a commission.

The language in Paragraph 8 of the Agreement is not helpful to the Defendant. The Defendant argues that because the mergers occurred within two years of his termination of his relationship with the Plaintiff he is entitled to the 2½% commission.

Accepting this argument would lead to the result, under the facts of this case, that if the Defendant had not terminated his relationship with the Plaintiff he would not have been entitled to a commission on the mergers, since the merger with S & S occurred on October 1, 1984, over five years after the end of the consummation period, and the merger with CH & E occurred on January 11, 1985, again over five years after the end of the consummation period. However, under the Defendant's argument, the termination of his relationship with the Plaintiff extended the period during which he was entitled to a commission until May 1, 1985.

Under the Defendant's argument if he contacted a prospect and reported it to the Managing Partner and the Managing Partner registered the contact, it is conceivable that the period during which he would be entitled to a commission could be extended for 2 years after the termination of his relationship with the Plaintiff even though no negotiations had occurred for 10, 15, or more years, which would indeed be an absurd result.

The Defendant argues in his brief that despite the language of Paragraph 6 there are two instances in which Downs received commissions for mergers that he promoted that took place more than five years after his first contact with the prospective mergees. The brief, page 9, continues:

> ... Downs continued to work with each of the mergees more than five years after first contact with the assent of CB & H in each instance until the time each merger was consummated.

Therein lies the difference between those two mergers and the mergers for which commissions are claimed. In the two instances where commissions were paid, "Downs continued to work with each of the mergees more than five years after first contact with the assent of CB & H in each instance *until each merger was consummated* (emphasis added).

In the case before the Court for which commissions are claimed, according to the agreed statement of facts on page 4:

> ... On February 8, 1982, Downs and Gary Wolfe, the managing partner of CB & H, held a meeting with Mr. Sharp and Mr. Wright, the principals of Severance and Sharp, to discuss a potential merger with CB & H. *This meeting was Downs' last contact with Severance and Sharp.* (Emphasis added.) After Downs worked with Severance and Sharp, they merged with another firm and then demerged before later merging with CB & H. Severance and Sharp merged with CB & H on October 1, 1984.

As to the merger with CH & E the stipulated facts on pages 4 and 5 are:

> Downs first established contact with a representative of Conrad, Hoey, East & Co. concerning a merger with CB & H on October 20, 1974, pursuant to a lead given to Downs by CB & H. Downs had follow-up visits with partners of Conrad, Hoey, East & Co. on August 18, 1975; September 5, 1975; August 14, 1978; September 4, 1980; and September 3, 1981. Downs' meeting on September 3, 1981, with Mr. Hoey was his last contact with any representative of Conrad, Hoey, East & Co. Conrad, Hoey, East & Co. merged with CB & H on January 1, 1985....

As to the two instances in which Downs received commissions for mergers that he promoted and which took place more than five years after his first contact with the prospective mergees, page 5 of the stipulated facts, last sentence of the first complete paragraph states:

> ... Downs continued to solicit each of the mergees and made written reports more than five years after first contact at the request of CB & H in each instance until the time each merger was consummated, each merger being consummated prior to May 1, 1983. (Emphasis added).

Clearly, these facts would sustain a demand for and payment of a commision since Downs continued to solicit and made written reports more than five years after first contact at the request of the Plaintiff and in each instance until the time each merger was consummated, whereas, in the cases before the Court there was no contact by the Defendant with Severance & Sharp for over two years before merger, and in the case of Conrad, Hoey and East over three years before merger.

## CONCLUSIONS OF LAW

■ The Defendant is not entitled to recover any commissions from the Plaintiff because of the merger of Plaintiff, Cherry, Bekaert & Holland with either Severance and Sharp or Conrad, Hoey and East & Co. since Paragraph 6 of the Special Partnership Agreement precludes recovery of com-

missions because the mergers were consummated more than five years from the date of first contact with the mergees, and Downs had no contact with the mergees for more than two years before the merger was effective in one instance and for more than three years in the other instance.

■ The arbitration clause was not invoked by either party. A proceeding in the nature of declaratory judgment is a form of remedial procedure which is particularly appropriate where the basic issue underlying the Plaintiff's action is the interpretation or construction of a contract, and the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate as in this case. Where neither party has invoked the arbitration provision in the contract the Court need not decide the validity of that provision.

Each party will bear their own costs, including attorney's fees in this matter.

Any fact which is determined also to be a conclusion of law is so deemed and any conclusion of law which is determined to be a finding of fact is so deemed.

Based on the foregoing Findings of Fact and Conclusions of Law the Court will enter a judgment that the Plaintiff does not owe any commissions to Defendant for the merger transactions between the Plaintiff and Severance and Sharp and between the Plaintiff and Conrad, Hoey, East & Co.

## EXHIBIT A

## SPECIAL PARTNERSHIP AGREEMENT

### BETWEEN

### CHERRY, BEKAERT & HOLLAND

### AND

### JOSEPH R. DOWNS

THIS SPECIAL PARTNERSHIP AGREEMENT, made and entered into as of the 1st day of May, 1973, between CHERRY, BEKAERT & HOLLAND, a partnership, hereinafter called the Firm, and JOSEPH R. DOWNS, of Cobb County, Georgia, hereinafter called Special Partner.

### WITNESSETH THAT:

WHEREAS, the Firm is engaged in the practice of accountancy under the firm name of Cherry, Bekaert & Holland pursuant to a master partnership agreement dated May 1, 1963, as amended, with its principal office in Wilmington, North Carolina, and branch offices in various other cities; and

WHEREAS, said Joseph R. Downs has been a Special Partner with the Firm with respect to its Branch Offices in Atlanta, Georgia and Birmingham, Alabama, under the provisions of the agreement between him and the Firm, dated May 1, 1971; and

WHEREAS, he and the Firm have agreed that his relationship with the Firm, commencing as of June 1, 1973, shall be changed to that of a Special Partner at large for the Firm's practice development and the performance of other duties as hereinafter described;

NOW, THEREFORE, in consideration of the mutual benefits accruing to each of the parties hereunder and other valuable considerations herein mentioned, the parties do hereby agree:

### I. EFFECTIVE DATE AND DURATION

This agreement and the relationship hereunder between the parties shall continue until it is terminated by their mutual agreement or otherwise, as hereinafter provided.

### II. CAPITAL CONTRIBUTION

The Special Partner has not made and will not make any capital contribution to this partnership during the term hereof and the entire capital and assets thereof are and, unless hereafter mutually agreed in writing, shall continue to be the property of the Firm, and he shall not have any right, title or interest therein, or in the profits therefrom.

### III. PROMOTIONAL DUTIES OF SPECIAL PARTNER

1. The Special Partner shall promote the development and expansion of the Firm's practice by assisting in the acquisition of other existing accounting practices or the merger of other existing practices with that of the Firm, hereinafter sometimes referred to as the "new practice" or "new practices," subject to the terms and conditions hereinafter set forth and for which he shall receive compensation in the form of commissions as hereinafter provided. The words "acquisition" and "merger" may be used herein interchangeably and each shall include the other and shall mean the "effective acquisition date" or "effective merger date" wherever the context requires or admits. The word "consummation" also refers to the "effective date" of any merger or acquisition.

2. The Special Partner shall be entitled to receive a commission of seven and one-half percent (7½%) on such new practices he may bring into the Firm. This commission shall be figured on the lower of (1) the total billings of any such new practice for the last twelve (12) months immediately preceding the acquisition or merger, or (2) the total billings of such new practice for the first twelve (12) months immediately subsequent to the date of the acquisition or merger.

One-half of estimated total commission will be credited to his drawings account and treated as income to the partner on the effective date of the merger, and the balance due will be credited to his drawings account as of the end of the first year of the date of the merger.

3. When the Special Partner learns that a certain Certified Public Accountant or a firm of such accountants may desire to sell his or their practice to the Firm or merge such practice with that of the Firm, the Special Partner shall promptly make a written report of such prospect to the Managing Partner of the Firm. Such report shall be in the form and shall include the information required by the Managing Partner who shall consider such report and furnish the Special Partner instructions for further action in connection therewith from time to time.

4. The Special Partner shall continue to solicit such new practice or practices and keep the Managing Partner fully informed as to each prospect, in the manner and form prescribed by the Managing Partner until the merger of the prospect is consummated or abandoned by the Firm or until the expiration of the consummation period described below before such merger occurs. As hereinafter provided, the Special Partner shall not be entitled to any commission or other compensation of any kind with respect to any such merger brought to the Firm by any other member, employee or agent thereof and to avoid any misunderstanding whether the prospect was brought to the Firm by the Special Partner he shall keep the Managing Partner currently and fully informed in writing at all times of any and all of his prospects.

5. The "consummation period" for the purpose of this Article shall be (a) a period of five (5) years after the Special Partner's first contact with a prospect reported to and registered by the Managing Partner as above provided or (b) a period of not over two (2) years after the Special Partner's disability, his retirement, the termination of his relationship with the Firm or his death or (c) the abandonment by the Firm of the prospective merger, whichever occurs first. If any such prospective merger is not consummated before the expiration of the consummation period, all prospects shall become prospects of the Firm and the Special Partner shall not be entitled to any commission or other compensation although the merger is thereafter consummated by the Firm or any member, employee or agent thereof. Except in the event an abandonment of a prospect by the Firm is thereafter reopened by the Firm and a merger is consummated before the expiration of the consummation period applicable to that prospect, the Special Partner shall be entitled to his commission. The right of termination of this Special Partnership Agreement by the Special Partner or the Firm

shall not be affected, extended or limited by the running of any consummation period or other time period mentioned in this Article.

6. Any prospective acquisition or merger may be rejected by the Managing Partner for cause at any time before the consummation thereof without any liability on the part of the Firm as to payment of any commission or other compensation in connection therewith.

7. With respect to any merger he promotes which is consummated within one year of his disability, his retirement, his death, or the termination of his relationship with the Firm in any manner, he shall be entitled to a commission of five percent (5%) and if the merger is consummated within the second year after any such event he shall be entitled to a commission of two and one-half percent (2½%); provided that, in either case and except in event of his death, he shall have continued to solicit said prospect during such period by personal visit as requested by the Managing Partner and he shall have submitted a written report of such visits to the Managing Partner in the form required by him.

8. The Special Partner shall have a drawing account of Two Thousand Dollars per month, to be charged against commissions earned, payable the fifteenth (15th) and last days of each month, subject to any advancements made or chargeable to the Special Partner. The Special Partner shall repay to the Firm on demand, or upon termination of this agreement, any unearned drawing account credited or paid to him. Such unearned drawings if not paid on demand also may be withheld or deducted from any money, payments or account which may be due or become due to the Special Partner or to which he may become entitled under this agreement.

9. The Special Partner does not have the authority to and shall not sign, use the Firm's name in any contract, agreement, advertisement, commercial paper or other instrument of any kind or contract or assume any debt, liability or any other obligation, either express or implied, binding the Firm in connection with any such prospective acquisition or merger or otherwise without the prior written authorization by the Managing Partner.

10. All travel and other expenses of the Special Partner for or in connection with his activities mentioned above shall be paid by him and if any part thereof shall be advanced or paid to him by the Firm the same shall be charged to his drawing account. Such expenses for which he shall be responsible shall include, but shall not be limited to, the following: travel expenses, taxes, licenses, attendance at meetings, conventions and professional development courses, advertising, entertainment of prospects and others, membership in professional, social and civic clubs, and other associations and activities, and all other expenses whether or not related to or incurred by him directly or indirectly in locating or contacting prospects. Except, the Firm shall bear travel and other expenses incurred by the Special Partner in attending meetings held by the Firm or performing any duties when specifically required by the Managing Partner in advance in writing.

11. The Special Partner recognizes that this agreement provides full and adequate compensation for all services rendered or to be rendered by him and that no other compensation of any kind shall be incurred by the Firm or payable to him unless specifically authorized in writing by the Managing Partner of the Firm except as provided for in the agreement with Downs, Acton & Co. and Article IV of this agreement.

12. The Special Partner shall not make or attempt to make any assignment of any kind of his commissions or other compensation or take or suffer any other action to be taken which is designed to or may be claimed to obligate the Firm to pay any part of such commissions or compensation to any person, firm or corporation other than the Special Partner. If any claim for commission, compensation or any other payment is made against the Firm by any other agent, broker or other person, the Firm may deduct the amount thereof, and

any costs or expenses in connection therewith, from any account or fund due or which may become due to the Special Partner by the Firm.

13. This agreement shall not prevent the solicitation and handling of prospects for acquisition or merger by the Firm, its members, employees or agents, in addition to those of the Special Partner.

## IV. ACCOUNTING DUTIES

The Special Partner shall perform professional accounting services in any of the Branch Offices of the Firm for Firm clients when requested to do so by a Resident Managing Partner of any branch office. For such services he shall receive sixty percent (60%) of his portion of the billing at the time of the billing to such clients. Such percentage shall be treated by the Firm as memorandum charges until the client is actually billed. At that time such percentage shall be credited to his drawing account. Should this billing not be collected, it will be charged back to his drawings account. No expenses shall be charged to such clients except those directly related to the work for the client and properly chargeable to the client.

## V. GENERAL DUTIES OF SPECIAL PARTNER

The Special Partner shall devote all of his working time and attention to the partnership business and shall be subject to the following terms, conditions and limitations in addition to all other provisions of this agreement:

1. He shall not engage in or be employed in any other business or by any other person, firm or corporation, directly or indirectly without the prior written consent of the Firm, other than Acton Stamp and Coin Shop, Inc.

2. He shall devote his best skill and efforts and shall cooperate with the other partners in building up a successful business as a firm and not as an individual.

3. He shall keep the Managing Partner of the Firm informed of all of his work for and transactions on behalf of said Branch Offices and shall give to the Firm and its personal representative, when requested, a true and complete report of the work and information within his knowledge regarding the partnership business.

4. He shall not assign, mortgage, pledge, hypothecate or sell his interest in this partnership or any part thereof, or undertake to do so or enter into or undertake to enter into any agreement as the result of which any person, firm or corporation might claim to have become interested with him in this partnership, except with the prior written permission of the Firm.

## VI. MANAGEMENT

The Special Partner shall perform his duties in practice development under the direction and supervision of the Managing Partner and his accounting services under the direction and supervision of the Resident Managing Partner of the Branch Office in which such services are performed.

## VII. BANK ACCOUNTS

All money and receipts of the partnership received by the Special Partner, if any, shall be deposited immediately in the Firm's bank account or accounts.

## VIII. LIABILITY INSURANCE

If the Special Partner owns or operates an automobile or automobiles and/or aircraft, he shall at all times maintain a liability insurance policy or policies in not less than the following amounts: $100,000 injuries to one person; $200,000 injuries in one accident; and $50,000 property damage. He shall also carry a general public liability policy in an amount of not less than $100,-000.

## IX. CONFIDENTIAL INFORMATION AND FIRM NAME

The Special Partner shall not at any time before or after the termination of his relationship with the Firm, disclose to any person, firm or corporation the name or names of any clients of the Firm or the name or

names of any prospect or prospects with respect to practice development or any of its confidential information or transactions. He shall not at any time after his withdrawal from the Firm or other termination of this agreement use the Firm name or any part thereof alone or in conjunction with his own name or in any other way use the words "formerly with Cherry, Bekaert & Holland" or any other words to that effect.

## X. COVENANT NOT TO COMPETE

1. In consideration of the payments and benefits to be received by the Special Partner under this agreement and under the sale and purchase agreement between the Special Partner and Robert M. Caton as Sellers, and the Firm as Purchaser, dated January 1, 1970, the Special Partner agrees that the provision of paragraph eight of said sale and purchase agreement constituting their "covenant not to compete" are made a part of this agreement by this reference.

2. If the Special Partner becomes a unit holding partner in the Firm the "covenants not to compete" of said sales agreement and of this agreement shall be void.

## XI. LIABILITY AND INDEMNITY

1. The Special Partner shall not be liable for any debts, expenses or obligations of the Firm and shall not participate in any losses of the Firm, and the Firm shall indemnify and hold the Special Partner harmless against all loss incurred by it heretofore or arising hereafter unless such debts, expenses, obligations or losses result in whole or in part from his improper acts or neglect.

2. The Special Partner covenants and agrees to indemnify and save the Firm harmless from and against all actions, debts, liens, encumbrances, damages, costs, charges and expenses of all kinds, including court costs and counsel fees, resulting from or in any way in connection with the property conveyed and transferred to the Firm by the sale and purchase agreement mentioned above, the operation of his for-

mer accounting firm or his personal affairs, or in connection with his service as a Special Partner of the Firm under his prior agreements or under this agreement, or because of any property the Firm may, in its discretion, find necessary to release or surrender to any claimant, or any indebtedness or other obligation the Firm may, in its discretion, find necessary to pay or assume, for which the Special Partner is in any way responsible or liable in any degree. The Special Partner further agrees that any amount or amounts or obligations paid out or assumed or suffered by the Firm may be withheld or deducted from any money, payments or account which may be due or become due to the Special Partner or to which he may become entitled.

## XII. FIRM NOT AFFECTED BY THIS AGREEMENT

The admission of the Special Partner with respect to said Branch Offices, or any termination of this agreement, shall not operate to dissolve the partnership between the members of the Firm as constituted by the above mentioned master partnership agreement between them or impair or in any way adversely affect such agreement or anything therein contained.

## XIII. FIRM MAY ADMIT OTHER PARTNERS AND EMPLOYEES

The Firm may admit additional partners or employ additional personnel in any capacity, or otherwise change the membership of the Firm, at any time on such terms as the Firm shall determine and such admission, employment or changes shall not terminate this agreement.

## XIV. WITHDRAWAL AND TERMINATION

1. Either party may terminate this agreement without cause by giving the other party ninety (90) days written notice prior to the effective date of such termination.

2. If the Special Partner violates any of the terms of this agreement, or by negligence, misconduct or wilful inattention to business causes serious injury to the business of the partnership, this agreement may be terminated immediately at the option of the Firm upon written notice. Such termination shall take effect at the end of the calendar month in which written notice of termination is delivered to such party or given to him by registered mail at his last known address, or at any earlier date stated in said notice.

3. After such termination he shall receive any unpaid commissions or other compensation due to him, subject to the provisions of paragraph 2 of Article XI above or any other applicable provisions hereof.

4. Any payments made as above provided shall constitute and be treated by the Firm as the distribution of profits and by the Special Partner as ordinary income.

5. If he is indebted to the Firm at the time of termination, the amount of such indebtedness shall be immediately due and payable, and in event of default in payment, interest at the rate of six percent (6%) per annum shall accrue thereon from the date of default until the same is fully paid.

## XV.  DISABILITY

If the Special Partner shall become disabled during the existence of this agreement he shall receive any unpaid commissions or other compensation due to him subject to the provisions of paragraph 2 of Article XI and paragraph 4 of Article XIV and any other applicable provisions hereof.

## XVI.  DEATH

1. The death of the Special Partner shall terminate this agreement and dissolve the partnership as to him but not as to the surviving partners. The Firm shall be continued by the surviving partners without posting any bond or filing inventory or accounts which might be required by law except for this agreement.

2. After the Special Partner's death his estate or other successor in interest shall receive any unpaid commissions or other compensation due to him under this agreement, subject to the provisions of paragraph 2 of Article XI and paragraph 4 of Article XIV above or any other applicable provisions hereof.

3. In event he is indebted to the Firm in any amount, it shall be due and payable immediately to the Firm by his estate, and in event of default, interest shall accrue thereon at the rate of six percent (6%) per annum from date of death until it is paid.

4. Neither his heirs nor his personal representative or other successor in interest shall have any right to and shall not participate in the business of the handling of the affairs of the Firm or any Branch Office thereof.

## XVII.  ARBITRATION

If any dispute should arise between the parties which they are unable to adjust amicably, either with regard to the meaning of any provision of this agreement or any other matter relating to the partnership business, except with respect to the Special Partner's withdrawal or retirement from the Firm as herein provided which shall not be subject to arbitration, such dispute shall forthwith be submitted to arbitration. One arbitrator shall be selected by the parties on each side of the dispute and these two shall select the third arbitrator, and the decision of a majority of these three arbitrators shall be final and binding upon the parties hereto. If the party or parties receiving notice from the other party or parties of the selection of his or their arbitrator fails or fail to select an arbitrator within five (5) days after receipt of such notice, then upon application of the party or parties who gave the notice, the Clerk of the District Court of the district in which the applicant or applicants reside shall appoint such an arbitrator.

## XXIII.  PERSONS INCLUDED

This agreement shall extend to and bind the respective parties hereto jointly and

**1108**

severally, and their respective heirs, executors, administrators, successors and assigns.

## XIX. SEVERABILITY

If any part, term or provision of this agreement shall be determined by the courts to be invalid or unenforceable, all other provisions nevertheless shall remain valid and effective as it is the intention of the parties that each provision hereof is being agreed upon separately.

## XX. FORMER AGREEMENTS

The several Special Partnership Agreements heretofore made between the parties hereto are terminated except as to certain parts and provisions thereof which have been reiterated herein by reference or by actual or substantial quotation.

## XXI. TESTIMONIUM CLAUSE

IN WITNESS WHEREOF, the parties hereto have executed this agreement in triplicate originals, the day and year first above written.

CHERRY, BEKAERT & HOLLAND
By: /s/ Harry W. Cherry (SEAL)
Managing Partner
/s/ Joseph R. Downs (SEAL)
Special Partner

## JUDGMENT

In accordance with the Memorandum of Decision in this matter filed simultaneously with this Judgment,

IT IS, HEREBY, ORDERED, ADJUDGED, AND DECREED that:

(1) The Plaintiff is not indebted to the Defendant in any amount by reason of the Special Partnership Agreement between Cherry, Bekaert & Holland and Joseph R. Downs;

(2) The Defendant have and recover nothing on his Counterclaim against the Plaintiff and the Counterclaim is DISMISSED; and

(3) Each party pay their own costs, including attorney's fees.